UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
and THE STATE OF FLORIDA,
*ex rel.* VINCENT NAPOLI,
UNHA SIN and UNJEN SIN,

      Plaintiffs,

v.                                                CASE NO:  8:14-cv-2952-T-33TBM

PREMIER HOSPITALISTS PL,
PRIMED BILLING LLC, and
MANISH SHARMA, DO, individually,

      Defendants.
_____/

## ORDER

This cause comes before the Court pursuant to Defendants Manish Sharma, DO, and Premier Hospitalists, PL's Motion to Dismiss (Doc. # 43), and Defendant Primed Billing LLC's Motion to Dismiss (Doc. # 44), both filed on June 24, 2016. Plaintiff relators Vincent Napoli, Unha Sin, and Unjen Sin filed responses in opposition on August 5, 2016 (Doc. # 49), and August 8, 2016 (Doc. # 50). Premier and Sharma filed two Notices of Supplemental Authority on August 19, 2016, and September 27, 2016. (Doc. ## 53, 56). For the reasons that follow, the Motions are granted and the Amended Complaint is dismissed without prejudice.

## I.   Background

Defendant Manish Sharma, DO, is the founder and owner of Defendant Premier Hospitalists, PL ("Premier"), which provides

patient care and clinical management services to hospitals. (Doc. # 1 at ¶¶ 2-3). Specifically, Premier contracts with Tampa General Hospital and St. Joseph's Hospital to provide medical care to patients by hiring nurse practitioners, physician assistants, medical doctors, and doctors of osteopathic medicine to visit those hospitals and perform "rounds." (Id. at ¶¶ 27-28). During these rounds, Premier's medical employees are assigned patients from a census sheet, which includes between forty and one hundred patients per day, and then they provide medical assessment, diagnoses, and treatment plans to their assigned patients. (Id. at ¶¶ 29-31).

Plaintiff Unha Sin began working for Premier on February 9, 2014, as a nurse practitioner. She worked closely with Dr. Sharma until her employment with Premier ended on November 5, 2014. As a result of her approximately nine month employment there, Plaintiffs allege that Unha Sin had "in-depth knowledge of Premier's fraudulent billing practices." (Id. at ¶ 6).

Plaintiff Vincent Napoli worked as the Vice-President of Premier from May of 2014, until about October 15, 2014. In that position, Napoli also "worked closely with Dr. Sharma and has in-depth knowledge of Premier's fraudulent billing practices" because his job entailed, among other duties: entering into contracts with hospitals and patient care facilities on behalf of Premier; hiring and firing office staff; and, representing Premier in meetings with hospitals, patient care facilities, and various corporate

officers of hospitals and other medical care facilities. (Id. at ¶ 5).

Plaintiff Unjen Sin, the sister of Unha Sin, worked for Premier as a Medical Administrator, and was still working for Premier when the Amended Complaint was filed. (Id. at ¶ 7). As a medical administrator, Unjen Sin "worked closely with Dr. Sharma and has in-depth knowledge of Premier's fraudulent billings practices." (Id.).

Through their respective positions with Premier, Plaintiffs state that they became aware of the existence of three different "schemes" by Dr. Sharma and Premier through which false claims were supposedly submitted to the Government. First, Premier billed for services performed by nurse practitioners and physician assistants as though the physician performed the service, because physician's services command higher rates. (Id. at ¶¶ 27-53).

In the second alleged scheme, Dr. Sharma allowed other physicians, who did not possess their own Medicaid and Medicare numbers, to bill for services using his Medicaid and Medicare numbers. (Id. at ¶¶ 54-62). As an example, Plaintiffs state that Dr. Sharma allowed a Dr. Carson to use Dr. Sharma's personal Medicare billing number; after reimbursement from Medicare, Dr. Sharma would pay Dr. Carson by check. (Id. at ¶ 60). Furthermore, Dr. Sharma hired other doctors as "moonlighters" when Premier was understaffed. These moonlighters were temporary employees, whom

3

Dr. Sharma paid $40 per patient treated. (Id. at ¶¶ 54-58). Dr. Sharma would then bill Medicare for the moonlighters' services under his Medicare number. (Id. at ¶ 57). Plaintiffs state that Primed, "through its communications with Dr. Sharma, was well aware that it was billing Medicare and Medicaid for patients never seen by Dr. Sharma yet were billed under his name." (Id. at ¶ 58)

The third scheme involved the intentional "upcoding" of services by Dr. Sharma and Premier. (Id. at ¶¶ 63-74). Napoli received a telephone call from the Centers for Medicare and Medicaid Services "who questioned him about Premier's abnormally high frequency of the intensive care unit code, Code Number 99223, which [was] being submitted to Medicare for payment." (Id. at ¶ 63). Plaintiffs point out that code 99223 "pays a significantly higher amount from Medicare than other codes." (Id. at ¶ 66). According to Plaintiffs, Dr. Sharma instructed his Director of Billing, Lance Myers, "to change the billing codes to reflect that Premier's providers were performing intensive care services when in reality they were not." (Id.). Plaintiffs state that "Myers submitted the bills to Primed who in turn submitted them to Medicare and Medicaid." (Id. at ¶ 67).

Furthermore, Plaintiffs allege that the fraudulent practices were perpetrated by Premier, Dr. Sharma, and Primed as co-conspirators. (Id. at ¶ 8). Defendant Primed provides full-service practice and billing management solutions to medical practices.

(Id. at ¶ 4). Primed handled the billing for Premier until around August 18, 2014, at which point Premier began using a new billing service provider, Medenet. (Id.). According to Plaintiffs, Primed conspired with Premier and Dr. Sharma and continued to process Premier's billing claims because Primed received a five percent commission of all fees recovered from Medicare by Premier. (Id. at ¶ 69).

Additionally, Plaintiffs describe the events between Premier and Medenet, the billing service provider with which Premier contracted after Primed. On a conference call with Medenet's owner, Val Patel, on which all three Plaintiffs among other employees were participants, Patel concluded that Premier's billing practices were "clearly fraudulent" following her review of Premier's billing records. (Id. at ¶¶ 71-72). Patel informed Premier that Medenet would not process Premier's fraudulent bills and could only maintain a working relationship with Premier if the alleged billing practices were rectified. (Id. at ¶ 73).

On November 25, 2014, Plaintiffs filed their Complaint against Premier, Dr. Sharma, and Primed under seal, alleging violations of the False Claims Act, 31 U.S.C. § 3729(a), and the Florida False Claims Act. (Doc. # 1). On February 12, 2016, the Government declined to intervene. (Doc. # 10). Defendant Primed then moved to dismiss the Complaint on May 4, 2016. (Doc. # 23). A Motion to Dismiss from Premier and Dr. Sharma followed on May

25, 2016. (Doc. # 33). Those Motions were denied as moot because Plaintiffs chose to amend their Complaint, which they subsequently filed on June 10, 2016. (Doc. # 41).

In response, the Defendants have filed a second round of Motions to Dismiss, pursuant to Rules 9(b) and 12(b)(6), arguing that the Amended Complaint suffers from the same flaws as the original complaint. (Doc. ## 43, 44). Specifically, Defendants contend that the Amended Complaint fails to meet Rule 9(b)'s heightened pleading standard because it does not allege specific false claims actually submitted to the Government. Plaintiffs reply that the Amended Complaint's allegations, combined with Plaintiffs' insider knowledge of Premier's business practices, sufficiently state a claim to survive the motion to dismiss stage, even under Rule 9(b)'s heightened pleading standard.

## II.  Legal Standard

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

6

However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

## III. **Analysis**

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." However, Rule 9(b) of the Federal Rules of Civil Procedure places more stringent pleading requirements on cases alleging fraud, such as the present one. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1305 (11th Cir. 2002). Rule 9(b) is satisfied only if the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [the] same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). When an FCA claim is at issue, district courts must

disregard assertions of law and conclusory statements of fact regarding a defendant's alleged fraudulent submissions to the Government. <u>See</u> <u>Clausen</u>, 290 F.3d at 1312. Furthermore, the Eleventh Circuit held:

> Rule 9(b) requires "some indicia of reliability . . . in the complaint to support allegations of an *actual false claim* for payment being made to the Government." <u>Clausen</u>, 290 F.3d at 1311. Plaintiffs need not prove their allegations in the complaint but must provide particular facts so the Court is not "left wondering whether a plaintiff has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit." <u>Id.</u> at 1313.

<u>Mitchell v. Beverly Enters., Inc.</u>, 248 F. App'x 73, 74–75 (11th Cir. 2007)(citing <u>Clausen</u>, 290 F.3d at 1311)(emphasis in original).

The FCA permits private persons to file *qui tam* actions on behalf of the United States against any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

31 U.S.C. § 3729(a). Plaintiffs allege violations of all three subsections.

Under the FCA, a person acts "knowingly" when he "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Furthermore, a "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested." 31 U.S.C. § 3729(b)(2).

Thus, to succeed on an FCA claim, a relator must prove: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant[s] to the United States for payment or approval; (3) with knowledge that the claim was false." Walker v. R & F Props. of Lake City, Inc., 433 F.3d 1349, 1355 (11th Cir. 2005).

The statute provides for a "civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...." 31 U.S.C. § 3729(a). This bounty provision encourages litigation. As stated by the Supreme Court, qui tam suits "are motivated primarily by prospects of monetary reward, rather than public good" and "raise a high risk of abusive litigation." Hughes Aircraft Co. v. Schumer, 520 U.S. 939, 949 (1997); Twombly, 550 U.S. at 569 n.14. Nevertheless, "[w]hen considering a motion to dismiss for failure to plead fraud with particularity, the Court must be careful to harmonize the directives of Fed. R. Civ. P. Rule 9(b) with the broader policy of notice pleading." United

States ex rel. Childress v. Ocala Heart Inst., Inc., No. 5:13-cv-470-OC-22PRL, 2015 WL 10742765, at *2 (M.D. Fla. Nov. 23, 2015).

"Because the Florida False Claims Act is modeled after the Federal False Claims Act, the claims will be analyzed using the same general standards." United States v. Cypress Health Sys. Florida, Inc., No. 1:09CV137-SPM-GRJ, 2012 WL 467894, at *1 (N.D. Fla. Feb. 14, 2012); see also United States ex rel. Heater v. Holy Cross Hosp., Inc., 510 F. Supp. 2d 1027, 1034 n.5 (S.D. Fla. 2007).

### A. **Presentment and False Statement**

The *sine qua non* of any FCA case is the submission of a false claim for payment to the Government. Clausen, 290 F.3d at 1311. Plaintiffs, insiders of Premier, pled in detail improper business practices by Premier and Dr. Sharma, which they claim led to the submission of false claims being presented to and paid by the Government. Furthermore, Plaintiffs allege that Primed participated in a conspiracy with Dr. Sharma and Premier to implement these schemes in order to increase profits for all Defendants. Yet, the Amended Complaint lacks sufficient detail regarding the actual submission of false claims to the Government. Thus, Plaintiffs have failed to meet the pleading requirements of Rule 9(b).

In conducting its analysis, this Court finds instructive Atkins v. McInteer, 470 F.3d 1350 (11th Cir. 2006). In Atkins, the relator alleged that defendants created an elaborate scheme for

defrauding the Government through the submission of false claims to Medicare. Even though the complaint listed particular patients, dates, and corresponding medical codes, the Eleventh Circuit held that the relator failed to provide the nexus "showing that the defendants actually submitted reimbursement claims for the services." Id. at 1359.

The Eleventh Circuit further held that the FCA does not allow a plaintiff "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." Id. at 1357 (citing Clausen, 290 F.3d at 1311). Finally, the Eleventh Circuit determined that the relator summarily concluded, without specifically alleging, that the defendants submitted false claims to the Government for reimbursement, and accordingly, the Eleventh Circuit affirmed the dismissal of the case with prejudice. Id. at 1355.

The holding in Atkins differs significantly from that in the unpublished Hill v. Morehouse Medical Associates., Inc., No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003). In Hill, the Eleventh Circuit reversed the dismissal of a FCA complaint, finding that a former medical billing and coding employee satisfied Rule 9(b)'s particularity requirement when she claimed in her complaint that she had firsthand knowledge that her employer submitted false

claims. Id. at *5. In Hill, the relator worked for seven months in the department responsible for claims submission. Id. at *4. Hill saw the defendant's billers, coders, and physicians alter various billing codes and thus submit false claims for Medicare reimbursement to the Government:

> Hill asserted that she *observed* Sylvia Washington, Theresa Bougelow, and Nicole Toomer change the diagnosis code for routine physical examinations, which are not reimbursed by Medicare, twenty-five to thirty times per week. Based upon information and belief, she further alleged that these changes were made at the instruction of Pat Newbill, the manager of MMA's billing and coding department.

Id. at *1 (emphasis added).

Plaintiffs argue that they are more akin to the relator in Hill than in Atkins. According to Plaintiffs, Napoli, having served as Vice-President of Premier for five months, had access to numerous documents, and a privileged position from which to observe Dr. Sharma's billing and coding practices, as well as Dr. Sharma's communications with Primed. But Plaintiffs do not describe the content of the communications between Dr. Sharma and Primed or allege that Napoli witnessed these communications.

Nor do Plaintiffs state that Dr. Sharma informed Napoli of the various billing schemes. Plaintiffs attach a Practice Summary Financial Report, listing doctors billing for Premier. (Doc. # 41, at Ex. D). One doctor included on the Report is Dr. Carson, whom the Plaintiffs allege was not an employee of Premier, who had his own practice, and billed under Dr. Sharma's personal Medicare

12

billing number. (Id. at ¶ 60). Plaintiffs contend this is proof that false claims were submitted to the Government. However, while the Report may indicate that Dr. Carson billed through Primed, it does not show that Dr. Carson actually billed Medicare, or did so using Dr. Sharma's Medicare billing number. Essentially, Plaintiffs argue that Napoli's firsthand experience at Premier offers sufficient indicia of reliability to their claims, but do not provide instances in which Napoli witnessed the submission of false claims or was told by Defendants about the fraudulent nature of Defendants' billing practices.

Unha Sin worked for Premier as a nurse practitioner for nine months and argues that she saw doctors employed by Premier claim in their notes to have visited patients and provided services that were solely provided by nurse practitioners and physician assistants. Additionally, doctors allegedly backdated their patient notes, or submitted notes stating they treated a patient weeks after the patient had actually been treated by nurse practitioners like Unha Sin. In support of these assertions, Plaintiffs provide, as an example, that a Dr. Venzor entered progress notes for a particular patient treated by Unha Sin. Dr. Venzor entered the notes two weeks after the date on which he stated he visited the patient. (Doc. # 41 at ¶ 51, Ex. B). However, the notes show the date on which doctors made their entries; they do not show that doctors actually backdated or otherwise falsified

their notes. While entering patient notes weeks after supposed treatment may be bad practice, it does not provide reliability to Plaintiffs' claims that false claims were submitted to Medicare.

Plaintiffs also argue that Premier refused to provide physician assistants and nurse practitioners, like Unha Sin, with their own Medicare billing numbers in order to bill all services under the physician's codes and increase the Medicare reimbursement. (Doc. # 41 at ¶ 42). Plaintiffs cite to United States ex rel. Walker v. R & F Properties of Lake City, Inc., 433 F.3d 1349 (11th Cir. 2005), in support of their argument that such firsthand knowledge gained by a nurse practitioner meets the heightened pleading requirements of Rule 9(b), even without evidence of specific fraudulent claims submitted to the Government. However, Walker is distinguishable. Plaintiff Walker, like Unha Sin, was not provided with her own Medicare billing number. Id. at 1360. But, unlike Sin, Walker was responsible for billing the services she provided and was "instructed each day which doctor she would be billing under." Id. (citation omitted). She was instructed to bill all services she provided as "incident to the service of a physician," even when that was not the case. Id. Furthermore, when Walker questioned this practice, she was informed by the office administrator that the defendant "billed all nurse practitioner and physician assistant services as rendered 'incident to the service of a physician'" and never billed

14

these services in another manner. Id. Thus, Walker had alleged sufficient firsthand knowledge of her employer's billing practices because she was instructed to bill, and had billed, her services under improper billing codes. Id.; see also United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014)("a plaintiff-relator without firsthand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation").

In contrast, Unha Sin did not bill for her services under a physician's billing number; rather, she speculates that the assignment of billing numbers to doctors only allowed those doctors to bill Medicare improperly for the services that had been provided by nurse practitioners like Unha Sin. She has not alleged that she billed or saw her services billed by doctors as though they had treated the patients, unlike the Walker plaintiff who improperly billed for her services at the behest of her employer. Cf. Atkins, 470 F.3d at 1359 (affirming dismissal with prejudice of complaint where relator was a "psychiatrist responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement").

Additionally, Plaintiffs do not allege that Unha Sin was informed by a billing employee that Defendants' policy was to have doctors bill for nurse practitioners' services as though the

doctors had provided those services. In <u>United States ex rel.</u> <u>Sanchez v. Lymphatx, Inc.</u>, 596 F.3d 1300 (11th Cir. 2010), the Eleventh Circuit affirmed dismissal of the relator office manager's claims of Medicare-billing fraud and distinguished <u>Walker</u> from <u>Sanchez</u>, writing:

> Specifically, [Walker] alleged that the defendant's office administrator had told her that the defendant billed Medicare at arguably inflated rates. Sanchez's vague allegations that she "found [unspecified] documentation" and "discovered" or "learned" that the defendants had submitted false claims, by contrast, leaves us "wondering whether [she] has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit."

<u>Id.</u> at 1303 n.4 (citation omitted). Thus, the fraudulent billing claims were appropriately dismissed because Sanchez had not alleged "at least some examples of actual false claims," and thus could not "lay a complete foundation for the rest of [her] allegations." <u>Id.</u> at 1302-03 (quoting <u>Clausen</u>, 290 F.3d at 1311-12). Plaintiffs' allegations regarding Unha Sin's work as a nurse practitioner are more similar to those in <u>Sanchez</u> than <u>Walker</u>, and provide only conjecture that the suspicious practices regarding how doctors kept patient notes and billed the services of nurse practitioners led to the actual submission of false claims.

Finally, Plaintiffs allege that Unjen Sin's work as a medical administrator for Premier gave her reliable firsthand knowledge of Defendants' fraudulent practices. However, Plaintiffs do not allege that Unjen Sin, as a medical administrator, had billing

responsibilities or had access to Premier's files and billing system. See Hill, 2003 WL 22019936, at *4 ("Most important, . . . Hill was privy to MMA's files, computer systems, and internal billing practices that are vital to her legal theory . . ."). Plaintiffs do not allege that Unjen Sin had any billing responsibility while employed by Premier. See Mastej, 591 F. App'x at 704 ("a plaintiff-relator without firsthand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation"). Furthermore, Plaintiffs do not allege that Unjen Sin saw employees of Defendant alter billing information or submit false claims, unlike the billing and coding employee relator in Hill. See id. ("[S]he alleged that she observed MMA billers, coders, and physicians alter various CPT and diagnosis codes over the course of seven months and thus submit false claims for Medicare reimbursement to the Government"). Thus, even taking all the allegations as true, Plaintiffs do not provide a factual basis to support that Unjen Sin, as a medical administrator, had firsthand knowledge of the Defendants' billing practices like the relator in Hill.

Even if Walker and Hill, the cases upon which Plaintiffs heavily rely, were not distinguishable on their facts, the Eleventh Circuit has held that "to the extent that Walker conflicts with the specificity requirements of Clausen, our prior-panel-precedent rule requires us to follow Clausen." Sanchez, 596 F.3d at 1303;

see also Atkins, 470 F.3d at 1358 ("[T]he prior panel rule would dictate that Clausen supersedes Hill to the extent that Hill is inconsistent with Clausen").

Although Plaintiffs focus on their status as insiders of Premier, that status, without more, does not provide sufficient indicia of reliability to satisfy Rule 9(b). See, e.g., Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1325 (11th Cir. 2009)(requiring employee sales representatives to link the fraudulent scheme to the submission of false claims); see also Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (stating that sales representative's allegation that he was "aware" of billing practices was neither particular to any specific fraudulent claim, nor factually supported); United States ex rel. Jallali v. Sun Healthcare Grp., No. 12-61011-CIV, 2015 WL 10687577, at *7 (S.D. Fla. Sept. 17, 2015), aff'd sub nom. Jallali v. Sun Healthcare Grp., No. 15-14231, 2016 WL 3564248 (11th Cir. July 1, 2016)(dismissing with prejudice employee's amended complaint where she pled deceptive business practices in detail without "any specific allegations that Defendants actually submitted false claims to the [G]overnment or that the [G]overnment made any payments").

The Court finds that Plaintiffs' various positions with Premier, as Vice-President, nurse practitioner, and medical administrator, may have provided them with insider knowledge of

Premier and Dr. Sharma's business practices and relationship with Primed. However, their insider knowledge of Defendants' alleged schemes cannot create the inference that fraudulent claims were actually presented to the Government for payment. See Corsello, 428 F.3d at 1014 (affirming dismissal where former sales representative of defendant "provided the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices, but he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the Government"). Plaintiffs have not pled with particularity that any claims arising out of the back-dated patient notes, billing by other doctors under Dr. Sharma's code, or "upcoding," were submitted to the Government and paid.  The Court cannot draw inferences in favor of the relators concerning the submission of fraudulent claims because doing so would strip "all meaning from Rule 9(b)'s requirements of specificity." Corsello, 428 F.3d at 1013 (citing Clausen, 290 F.3d at 1312 n.21).

## B. Conspiracy

Plaintiffs' conspiracy allegations also fall short. Complaints alleging a conspiracy to violate the FCA are also subject to Rule 9(b)'s heightened pleading standard. Corsello, 428 F.3d at 1014 ("The district court correctly dismissed [the relator's] [conspiracy count] for failure to comply with Rule 9(b)."). A defendant is liable for conspiracy if the relator can prove two elements: (1) that the defendant conspired with at least

one person to get a false or fraudulent claim paid by the Government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid. United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009)(internal citations omitted). "Conspire" in this context requires a meeting of the minds "to defraud the Government." Id. (citing Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)).

Although the Eleventh Circuit has not spoken definitively on the issue, district courts in the Eleventh Circuit — and at least one other circuit court — have held that a failure to adequately allege the existence of a false claim is fatal to a conspiracy claim. See, e.g., United States ex rel. Chase v. LifePath Hospice, Inc., No. 8:10-cv-1061-T-30TGW, 2016 WL 5239863, at *8-9 (M.D. Fla. Sept. 22, 2016); United States ex rel. Marsteller v. Tilton, No. 5:13-cv-830-AKK, 2016 WL 1270586, at *7 (N.D. Ala. Mar. 21, 2016); United States ex rel. Potra v. Jacobson Cos., Inc., No. 1:12-cv-1600-WSD, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014); accord United States ex rel. Vigil v. Nelnet, Inc., 639 F.3d 791, 801 (8th Cir. 2011) ("Because the Complaint fails to state claims under sections 3729(a)(1) and (2), it likewise fails to state an actionable conspiracy claim under § 3729(a)(3)."). As one district court reasoned:

> Because the existence of a false claim — whether
> ultimately paid by the Government or not — is an element
> of a cause of action for conspiracy to violate the FCA,
> the failure of a relator to sufficiently plead that
> claim's existence necessarily means that, as a matter of
> law, the relator cannot prevail.

Chase, 2016 WL 5239863, at *8-9.

Regardless, the Court finds that Plaintiffs have not pled with particularity that a conspiracy existed between Dr. Sharma, Premier, and Primed. Plaintiffs allege that Primed, "through its communications with Dr. Sharma, was well aware that it was billing Medicare and Medicaid for patients never seen by Dr. Sharma yet were billed under his name." (Doc. # 41 at ¶ 58). They also rely on the statements of Premier's next billing company, Medenet, that it would not process Premier's claims because Medenet believed them to be fraudulent. (Id. at ¶¶ 71-73). Even taken as true, these allegations do not provide particularity regarding the existence of an agreement between the Defendants to submit false claims.

## IV.  **Dismissal Without Prejudice**

Even under the heightened pleading standards of Rule 9(b), a plaintiff typically should be given a chance to amend and provide necessary particularity. See Chase, 2016 WL 5239863, at *8-9 ("[O]rdinarily, courts should give plaintiffs at least one opportunity to amend before the court dismisses the complaint with prejudice")(citing Corsello, 428 F.3d at 1014); see also Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 568-69 (11th

Cir. 1994)(stating that relator "is entitled to one chance to amend the complaint and bring it into compliance with [Rule 9(b)]").

In their Responses to Defendants' Motions to Dismiss, Plaintiffs request, in the alternative, leave to file a Second Amended Complaint. (Doc. # 49 at 14; Doc. # 50 at 16). The Court notes that such a request is procedurally improper. See Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009)("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."). Nevertheless, the Court grants Plaintiffs leave to amend.

A district court need not allow a plaintiff to file an amended complaint where there has been "repeated failure to cure deficiencies by amendments previously allowed" or "where amendment would be futile." Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001). At the Case Management Hearing, the Court mentioned that the first motions to dismiss brought up the issue of insufficient particularity, leading Plaintiffs to elect to amend. (Doc. # 47 at 18). Defendants' first motions to dismiss included substantially the same arguments as their current Motions including that Plaintiffs had not sufficiently pled that a single particular false claim has been submitted. (Doc. ## 23, 33). Yet, Plaintiffs did not remedy this defect in their Amended Complaint, nor provide other indicia of reliability to support their conclusion that false claims were submitted to the Government. Cf. Chase, 2016 WL

22

5239863, at *11 (noting that "[t]he precedent compelling dismissal today is the same precedent that could have served as a model" for relator's amended complaints). The Court has concerns as to whether Plaintiffs will be able to plead their claim with sufficient particularity, as they have already had one opportunity to amend their complaint. Nevertheless, in all fairness, the Court will give Plaintiffs a third and final opportunity to state a cause of action with particularity, if they are able, by October 11, 2016.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendants Premier Hospitalists PL and Manish Sharma's Motion to Dismiss (Doc. # 43) is **GRANTED.**

(2) Defendant Primed Billing LLC's Motion to Dismiss (Doc. # 44) is **GRANTED.**

(3) The Amended Complaint (Doc. # 41) is **DISMISSED WITHOUT PREJUDICE.**

(4) Plaintiffs may file a Second Amended Complaint on or before **October 11, 2016**, failing which the Court will close the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of September, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE