UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
and THE STATE OF FLORIDA,
*ex rel.* VINCENT NAPOLI,
UNHA SIN and UNJEN SIN,

     Plaintiffs,

v.                        Case No.: 8:14-cv-2952-T-33TBM

PREMIER HOSPITALISTS PL,
PRIMED BILLING LLC, and
MANISH SHARMA, DO, individually,

     Defendants.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendants Manish Sharma, DO, and Premier Hospitalists, PL's Motion to Dismiss the Second Amended Complaint (Doc. # 69), filed on November 8, 2016, and Defendant Primed Billing LLC's Motion to Dismiss (Doc. # 70), filed on November 15, 2016. Plaintiff relators Vincent Napoli, Unha Sin, and Unjen Sin filed a response on December 22, 2016 (Doc. # 76). For the reasons that follow, the Motions are denied.

I. **Background**

Dr. Sharma is the founder and owner of Premier, which provides patient care and clinical management services to hospitals. (Doc. # 64 at ¶¶ 2-3). Specifically, Premier

1

contracts with Tampa General Hospital and St. Joseph's Hospital to provide medical care to patients by hiring nurse practitioners, physician assistants, and physicians to visit those hospitals and perform "rounds." (Id. at ¶¶ 27-28). Defendant Primed provides full-service practice and billing management solutions to medical practices. (Id. at ¶ 4). Primed handled the billing for Premier until August of 2014, at which point Premier began using a new billing service provider. (Id.).

Unha Sin began working for Premier on February 9, 2014, as a nurse practitioner. (Id. at ¶ 6). She worked closely with Dr. Sharma until her employment with Premier ended on November 5, 2014. (Id.). As a result of her nine month employment, Unha Sin had "in-depth knowledge of Premier's fraudulent billing practices." (Id.).

Napoli worked as the Vice President of Premier from May of 2014, until about October 15, 2014. (Id. at ¶ 5). In that position, Napoli also "worked closely with Dr. Sharma and has in-depth knowledge of Premier's fraudulent billing practices" because his job entailed, among other duties: "entering into contracts on behalf of Premier with hospitals and patient care facilities"; "hiring and firing office staff"; and, "representing Premier in meetings with hospitals, patient

care facilities, and various corporate officers of hospitals and other medical care facilities." (Id.).

Unjen Sin, the sister of Unha Sin, is employed by Premier as a medical administrator. (Id. at ¶ 7). Unjen Sin "worked closely with Dr. Sharma and has in-depth knowledge of Premier's fraudulent billings practices." (Id.). One of Unjen Sin's duties was "to put together a matrix, a daily log of all the billing codes from all the providers and to send [it] to Primed." (Id. at ¶ 60).

Through their respective positions with Premier, Plaintiffs state that they became aware of the existence of three different "schemes" by Dr. Sharma and Premier through which false claims were submitted to the Government. First, Premier billed for services performed by nurse practitioners and physician assistants as though the physician performed the service, because physicians charge higher rates. (Id. at ¶¶ 27-74).

Plaintiffs' description of the first scheme contains numerous new allegations. According to Plaintiffs, Napoli "began an investigation into the billing practices" of Premier because the monthly billing summaries that Primed returned to Premier showed that Premier and Dr. Sharma "were not collecting sufficient sums from the amounts billed to

3

Medicare/Medicaid." (Id. at ¶ 44). During that investigation, Napoli reviewed the billing documents and saw that Premier's physicians were billing for more than 24 hours in a day, as well as billing for the time that nurse practitioners and physician assistants visited patients, even though the physicians never treated those patients. (Id. at ¶¶ 45-46). For example, Dr. Venzor's "billing reflected billing Medicare/Medicaid 45 hours in a 24 hour day just on his patients." (Id. at ¶ 45). Napoli "found over 100 patients that will [sic] simultaneously billed as if both [Dr.] Sharma and [Dr.] Daram examined the patients on the same days from the monthly billing statements." (Id. at ¶ 55).

Napoli spoke with three nurse practitioners and two physicians employed by Premier about Dr. Sharma and Premier's billing practices. (Id. at ¶ 48). "Each confirmed that Dr. Sharma mandated that they charge as if they saw the patients for the maximum amounts of time" that could be billed for treatment. (Id. at ¶ 50). Dr. Venzor "informed Napoli that he followed the upcoding and billing policy of Dr. Sharma." (Id. at ¶ 59). Dr. Daram told Napoli that she also "followed [Dr.] Sharma's billing scheme and billing policy" and "like [Dr.] Sharma and [Dr.] Venzor would log into the EPIC records system at Tampa General Hospital, and sign off on the notes and

4

reports of the [nurse practitioners and physician assistants], as if they followed up and saw the patients when they did not." (Id. at ¶¶ 51, 53). While creating the matrix of daily billing codes, Unjen Sin saw that the codes billed by physicians working at Premier often "reflected again more than 24 hours" worth of patient treatment in a single day, and that the coded services "were then billed by Primed to Medicare/Medicaid . . . on [a] routine basis . . . and thus summarized back to Premier by Primed on a monthly report basis." (Id. at ¶¶ 60-61).

Additionally, according to Plaintiffs, Dr. Daram expressed to Napoli her concern that she would lose her license because of Premier's billing practices, and that she was looking for another job as a result. (Id. at ¶ 54). The nurse practitioner Sandy Phillips told Napoli that she was resigning because she was afraid she would lose her license because of the fraudulent billing practices. (Id. at ¶ 62).

In the second alleged scheme, Dr. Sharma allowed other physicians, who did not possess their own Medicaid and Medicare numbers, to bill for services using his Medicaid and Medicare numbers. (Id. at ¶¶ 75-83). Dr. Sharma hired other physicians as "moonlighters" — temporary employees whom Dr. Sharma paid $400 per patient when Premier was understaffed.

(Id. at ¶¶ 75-77). Dr. Sharma would then bill Medicare for the moonlighters' services under his Medicare number. (Id. at ¶ 78). Plaintiffs state that Primed, "through communications with Dr. Sharma, was well aware that it was billing Medicare and Medicaid for patients never seen by Dr. Sharma yet were billed under his name." (Id. at ¶ 79).

The third scheme involved the intentional "upcoding" of services by Dr. Sharma and Premier. (Id. at ¶¶ 84-95). Code 99223, for intensive care services, "pays a significantly higher amount from Medicare than other codes." (Id. at ¶ 87). Dr. Sharma instructed his billing director, Lance Myers, "to change the billing codes to reflect that Premier's providers were performing intensive care services when in reality they were not." (Id.). Then, "Myers submitted the bills to Primed who in turn submitted them to Medicare and Medicaid." (Id. at ¶ 88).

Plaintiffs assert that the fraudulent practices were perpetrated by Premier, Dr. Sharma, and Primed as co-conspirators. (Id. at ¶ 8). Plaintiffs allege that Napoli, during his investigation, confronted the owners and managers of Primed Billed, who "confirmed that they were aware of the [Dr.] Sharma and Premier billing policies and that was how they do things with their agreement with [Dr.] Sharma." (Id.

at ¶ 58). According to Plaintiffs, Primed conspired with Premier and Dr. Sharma and processed Premier's billing claims because Primed received a five percent commission of all fees recovered from Medicare by Premier. (Id. at ¶ 90).

On November 25, 2014, Plaintiffs filed their Complaint against Premier, Dr. Sharma, and Primed under seal, alleging violations of the False Claims Act, 31 U.S.C. § 3729(a), and the Florida False Claims Act, Fla. Stat. §§ 68.081, et seq. (Doc. # 1). On February 12, 2016, the Government declined to intervene. (Doc. # 10). Plaintiffs filed an Amended Complaint on June 10, 2016. (Doc. # 41). In response, Defendants filed Motions to Dismiss, pursuant to Rules 9(b) and 12(b)(6), which were granted with leave to amend on September 29, 2016. (Doc. ## 43-44, 57).

Plaintiffs filed their Second Amended Complaint on October 21, 2016. (Doc. # 64). Defendants filed Motions to Dismiss, arguing that the Second Amended Complaint suffers from the same flaws as the Amended Complaint. (Doc. ## 69, 70). Plaintiffs filed a response on December 22, 2016. (Doc. # 76). The Motions are ripe for review.

## II.  **Legal Standard**

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the

light most favorable to the plaintiff. <u>Jackson v. Bellsouth Telecomms.</u>, 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. <u>Stephens v. Dep't of Health & Human Servs.</u>, 901 F.2d 1571, 1573 (11th Cir. 1990)("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986). Furthermore, "[t]he scope of review must be limited to the four corners of the complaint." <u>St. George v. Pinellas Cty.</u>, 285 F.3d 1334, 1337 (11th Cir. 2002).

## III. **Analysis**

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). However, Rule 9(b) of the Federal Rules of Civil Procedure places more stringent pleading requirements on cases alleging fraud. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1305 (11th Cir. 2002). Rule 9(b) is satisfied only if the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [the] same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). Thus, when a FCA claim is at issue, district courts must disregard assertions of law and conclusory statements of fact regarding a defendant's alleged fraudulent submissions to the Government. See Clausen, 290 F.3d at 1312. Furthermore, the Eleventh Circuit held:

> Rule 9(b) requires "some indicia of reliability . . . in the complaint to support allegations of an *actual false claim* for payment being made to the Government." Clausen, 290 F.3d at 1311. Plaintiffs need not prove their allegations in the complaint

9

> but must provide particular facts so the Court is
> not "left wondering whether a plaintiff has offered
> mere conjecture or a specifically pleaded
> allegation on an essential element of the lawsuit."
> <u>Id.</u> at 1313.

<u>Mitchell v. Beverly Enters., Inc.</u>, 248 F. App'x 73, 74–75 (11th Cir. 2007)(citing <u>Clausen</u>, 290 F.3d at 1311)(emphasis in original).

"Rule 9(b) exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery." <u>United States ex rel. Kunz v. Halifax Hosp. Med. Ctr.</u>, No. 6:09-cv-1002-Orl-31DAB, 2011 WL 2269968, at *8 (M.D. Fla. June 6, 2011)(citing <u>United States ex rel. Longest v. Dyncorp</u>, No. 6:03-cv-816-Orl-31JGG, 2006 WL 47791, at *5 (M.D. Fla. Jan. 9, 2006)). Thus, "[w]hen considering a motion to dismiss for failure to plead fraud with particularity, the Court must be careful to harmonize the directives of Fed. R. Civ. P. Rule 9(b) with the broader policy of notice pleading." <u>United States ex rel. Childress v. Ocala Heart Inst., Inc.</u>, No. 5:13-cv-470-Oc-22PRL, 2015 WL 10742765, at *2 (M.D. Fla. Nov. 23, 2015).

The FCA permits private persons to file *qui tam* actions on behalf of the United States against any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); [or]

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a). Plaintiffs allege violations of all four subsections.

To succeed on an FCA claim, a relator must prove: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant[s] to the United States for payment or approval; (3) with knowledge that the claim was false." United States ex rel. Walker v. R & F Props. of Lake City, Inc., 433 F.3d 1349, 1355 (11th Cir. 2005). "Because the Florida False Claims Act is modeled after the Federal False Claims Act, the claims will be analyzed using the same general standards." United States v. Cypress Health Sys. Fla., Inc., No. 1:09CV137-SPM-GRJ, 2012 WL 467894, at *1 (N.D. Fla. Feb. 14, 2012); see also United States ex rel.

Heater v. Holy Cross Hosp., Inc., 510 F. Supp. 2d 1027, 1034 n.5 (S.D. Fla. 2007).

### A. **Presentment and False Statement**

The submission of a false claim for payment to the Government is "the *sine qua non* of a False Claims Act violation." Clausen, 290 F.3d at 1311. Plaintiffs, insiders of Premier, pled in detail improper billing practices by Premier and Dr. Sharma, which they claim led to false claims being presented to and paid by the Government. Furthermore, Plaintiffs allege that Primed participated in a conspiracy with Dr. Sharma and Premier to implement these schemes in order to increase profits for all Defendants. Although Plaintiffs do not identify a specific false claim submitted to the Government, the Court finds that the Second Amended Complaint contains sufficient indicia of reliability to meet the pleading requirements of Rule 9(b).

Plaintiffs argue that they are analogous to the relators in Hill v. Morehouse Medical Associates, Inc., No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003), and Walker, 433 F.3d 1349. The Court agrees. In Hill, the Eleventh Circuit reversed the dismissal of a FCA complaint, finding that a former medical billing and coding employee satisfied Rule 9(b)'s particularity requirement when she claimed in her

complaint that she had firsthand knowledge of her employer's submission of false claims. Hill, 2003 WL 22019936, at *5. Hill worked for seven months in the department responsible for claims submission. Id. at *4. Hill saw the defendant's billers, coders, and physicians alter various billing codes and thus submit false claims for Medicare reimbursement to the Government:

> Hill asserted that she *observed* Sylvia Washington, Theresa Bougelow, and Nicole Toomer change the diagnosis code for routine physical examinations, which are not reimbursed by Medicare, twenty-five to thirty times per week. Based upon information and belief, she further alleged that these changes were made at the instruction of Pat Newbill, the manager of MMA's billing and coding department.

Id. at *1 (emphasis added).

In Walker, relator Walker, who was a nurse practitioner like Unha Sin, was not provided with her own Medicare billing number. Walker, 433 F.3d at 1360. Walker was responsible for billing the services she provided and was "instructed each day which doctor she would be billing under." Id. (citation omitted). She was instructed to bill all services she provided as "incident to the service of a physician," even when that was not the case. Id. When Walker questioned this practice, she was informed by the office administrator that the defendant "billed all nurse practitioner and physician

13

assistant services as rendered 'incident to the service of a physician'" and never billed these services in another manner. Id. Thus, Walker had alleged sufficient firsthand knowledge of her employer's billing practices because she was instructed to bill, and had billed, her services under improper billing codes. Id.; see also United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014)("[A] plaintiff-relator without firsthand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation").

Although none of the Plaintiffs personally submitted fraudulent bills, they allege that they gained firsthand knowledge of the fraudulent billing practices at Premier through their work. According to Plaintiffs, Napoli, having served as Vice President of Premier for five months, had access to numerous billing documents, and a privileged position from which to observe Dr. Sharma's billing and coding practices, as well as Dr. Sharma's communications with Primed. Cf. Mastej, 591 F. App'x at 708 (reversing dismissal of FCA claim where the relator, as vice president of one defendant, "had direct information about both [defendants'] billings, revenues and payor mix, and he was in the very meetings where Medicare patients and the submission of claims

to Medicare were discussed"). Napoli, after discussion with Dr. Sharma, undertook an investigation of Premier's billing records to determine why Premier did not receive full reimbursement from the Government. (Doc. # 64 at ¶ 44). During that investigation, Napoli had access to Premier's medical records and the billing summaries provided by Primed to Premier, which summarized the bills submitted and reimbursed by the Government each month. (Id. at ¶¶ 45, 55).

Additionally, Plaintiffs allege that Napoli, after discovering apparent fraud in the billing documents, interviewed numerous Premier employees. Dr. Daram and Dr. Venzor confirmed to Napoli that Dr. Sharma had a policy of billing the maximum time allowable to each patient, regardless of how much time was actually spent, and of billing for treatment performed solely by nurse practitioners and physician assistants as if the physicians had also treated the patients. (Id. at ¶¶ 49, 51, 53, 59). According to the Plaintiffs, Dr. Daram and Dr. Venzor admitted that they submitted false billing of their time in accordance with this policy. (Id. at ¶¶ 51, 59).

Finally, Plaintiffs allege that Unjen Sin's work as a medical administrator for Premier also gave her reliable firsthand knowledge of Defendants' fraudulent practices. See

15

Hill, 2003 WL 22019936, at *4 ("Most important, . . . Hill was privy to MMA's files, computer systems, and internal billing practices that are vital to her legal theory . . ."); see also Mastej, 591 F. App'x at 704 ("a plaintiff-relator without firsthand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation"). Because her job entailed creating a matrix of all the codes billed by Premier to be submitted to Primed, Unjen Sin saw firsthand that the codes billed by physicians working at Premier often "reflected again more than 24 hours" worth of patient treatment in a single day, and that the coded services "were then billed by Primed to Medicare/Medicaid . . . on [a] routine basis . . . and thus summarized back to Premier by Primed on a monthly report basis." (Id. at ¶ 60); see Hill, 2003 WL 22019936, at *4 ("[S]he alleged that she observed MMA billers, coders, and physicians alter various CPT and diagnosis codes over the course of seven months and thus submit false claims for Medicare reimbursement to the Government").

Thus, taking the Second Amended Complaint's allegations as true, Plaintiffs provide a factual basis to support that Napoli, as Vice President, and Unjen Sin, as a medical administrator, had firsthand knowledge of the Defendants'

16

billing practices like the relators in Hill and Walker. The detailed description of the allegedly fraudulent schemes, and insider knowledge of and access to billing logs and summaries lend the Second Amended Complaint sufficient indicia of reliability to satisfy Rule 9(b). Cf. Longest, 2006 WL 47791, at *5 ("Longest has provided far more than mere conclusory allegations of fraudulent schemes or false claims for payment. She routinely provides specific examples, . . . of instances in which Dyncorp paid its employees and billed the Government . . . . And her allegations are buttressed by her status as a corporate insider with extensive familiarity with Dyncorp's billing practices and contractual obligations.").

Regarding the applicability of Hill and Walker to the Court's analysis, the Eleventh Circuit has written that "to the extent that Walker conflicts with the specificity requirements of Clausen, our prior-panel-precedent rule requires us to follow Clausen." Unites States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1303 (11th Cir. 2010). Similarly, if there is any conflict between Hill and Clausen, the Court is bound to follow Clausen. Unites States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358 (11th Cir. 2006)("[T]he prior panel rule would dictate that Clausen

supersedes Hill to the extent that Hill is inconsistent with Clausen.").

However, the Court does not find Hill and Walker inconsistent with Clausen. See United States ex rel. Brunson v. Narrows Health & Wellness, LLC, 469 F. Supp. 2d 1048, 1051 (N.D. Ala. 2006)("With respect to the potential conflict between Hill and Clausen, the court concludes that the two cases are not fundamentally inconsistent."). In Clausen, the Eleventh Circuit emphasized that Clausen was a competitor of the defendant, rather than an insider with firsthand knowledge of the defendant's fraudulent practices. Clausen, 290 F.3d at 1314. Regarding the value of insider knowledge, the court acknowledged that "an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the [FCA]." Id.

Furthermore, "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." Mastej, 591 F. App'x at 704 (citing Clausen, 290 F.3d at 1312 & n.21). Rather, "some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." Clausen, 290 F.3d at 1311 (emphasis original). "A relator can also provide the required

18

indicia of reliability by showing that he personally was in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." Mastej, 591 F. App'x at 707 (citing Walker, 433 F.3d at 1360; Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1326 (11th Cir. 2009)); see also Childress, 2015 WL 10742765, at *3 ("A relator may also provide sufficient indicia of reliability that false claims were submitted through first-hand knowledge of such submission.").

In Hill and Walker, as in this case, the relators were insiders to the respective defendants with personal knowledge of the defendants' fraudulent billing practices that provided their complaints with the indicia of reliability required by Clausen. Here, Plaintiffs have provided similar indicia of reliability: they have described the schemes in detail, recounted confirmations by Premier's doctors who billed falsely, reviewed the matrixes of bills submitted to Primed to be submitted to the Government, as well as the summaries sent by Primed to Premier outlining the bills submitted and the amounts recovered from the Government. Taken as true, these allegations meet the pleading requirements of Rule 9(b).

B. **Conspiracy**

Complaints alleging a conspiracy to violate the FCA are also subject to Rule 9(b)'s heightened pleading standard. Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005)("The district court correctly dismissed [the relator's] [conspiracy count] for failure to comply with Rule 9(b)."). A relator must establish "(1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the Government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid." United States ex rel. Chase v. LifePath Hospice, Inc., No. 8:10-cv-1061-T-30TGW, 2016 WL 5239863, at *8 (M.D. Fla. Sept. 22, 2016)(citing United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009)). "'Conspire' in this context requires a meeting of the minds 'to defraud the Government.'" Chase, 2016 WL 5239863, at *8 (citing Bane, 597 F. Supp. 2d at 1289; Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)).

Plaintiffs have pled with sufficient particularity that a conspiracy existed between Dr. Sharma, Premier, and Primed. Plaintiffs allege that Primed, "through its communications with Dr. Sharma, was well aware that it was billing Medicare

and Medicaid for patients never seen by Dr. Sharma yet were billed under his name." (Doc. # 64 at ¶ 79). Plaintiffs allege that Napoli spoke with the owners and managers of Primed, "who confirmed that they were aware of the [Dr.] Sharma and Premier billing policies and that was how they do things with their agreement with [Dr.] Sharma." (Id. at ¶ 58). According to Plaintiffs, Primed agreed to process Premier's fraudulent claims because Defendants had arranged for Primed to receive a five percent commission from the money reimbursed by the Government. (Id. at ¶ 90).

In short, Plaintiffs allege that an agreement to submit false claims to the Government existed between Defendants, which was personally confirmed by Primed's owners and managers, and that Primed agreed to the scheme because it receives five percent of all money recovered by Premier. Thus, the Second Amended Complaint provides factual allegations, rather than legal conclusions, about the existence of an agreement between Defendants. See Corsello, 428 F.3d at 1014 (affirming dismissal where the relator "alleged that 'Lincare and Varraux conspired to defraud the Government,' but this bare legal conclusion was unsupported by specific allegations of any agreement or overt act"). Taken as true, these allegations do provide the required particularity regarding

the existence of an agreement between the Defendants to submit false claims.

Although "a failure to adequately allege the existence of a false claim is fatal to a conspiracy claim," Chase, 2016 WL 5239863, at *9, the Court has already concluded that Plaintiffs have sufficiently pled the submission of actual false claims to the Government. Therefore, Plaintiffs have alleged that at least one Defendant took the overt step of submitting a false claim to be paid, and the second element of the conspiracy claim is met.

**IV.   Conclusion**

Although Plaintiffs must present evidence of actual false claims submitted to the Government to ultimately prove their case, the Second Amended Complaint pleads FCA violations with sufficient particularity to survive the motion to dismiss stage. See United States v. Crumb, No. CV 15-0655-WS-N, 2016 WL 4480690, at *28 (S.D. Ala. Aug. 24, 2016)("The Amended Complaint is not perfect, but perfection is not the applicable pleading standard. . . . The theories of False Claims Act liability, and the factual allegations upon which they rest, are set forth in ample detail to alert the defendants in this case to the precise misconduct with which they are charged, all with sufficient indicia of

22

reliability to protect defendants against spurious charges."). Therefore, Defendants' Motions are denied.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants Premier Hospitalists PL and Manish Sharma's Motion to Dismiss (Doc. # 69) is **DENIED.**

(2)   Defendant Primed Billing LLC's Motion to Dismiss (Doc. # 70) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 12th day of January, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE